# SOUTHERN CONSTRUCTION CO. v. SOUTHERN SURETY CO.

Eastern Section.   August 7, 1926.

Petition for Certiorari denied by Supreme Court, January 29, 1927.

Smith, Word & Anderson, all of Knoxville, for appellant.

R. B. Cassell and J. E. Travis, both of Harriman, for appellee.

SNODGRASS, J.   This bill was filed by the complainants to recover the sum of $2139, alleged to be an unearned premium on a

policy of contract insurance, and to enjoin the defendant from in-stituting any suit against the complainant in Davidson county or elsewhere, but requiring it to come into this cause and set up any rights and claims which it may have against complainant, and that the defendant, its agents, attorneys and servants be enjoined from filing its alleged claim against the complainant with the depart-ment of highways of the State of Tennessee, and from in any other manner interfering with, impeding or delaying the settlement of the department of highways with complainant on account of the construction of Federal Aid Project No. 12.

An injunction was issued and served.

The answer was filed as a cross-bill. It was admitted that on October 20, 1919 complainant entered into a contract with the de-partment of highways of the State of Tennessee for the construc-tion of a certain highway located in Union and Claiborne counties and known as Federal Aid Project No. 12; that the estimated cost of this construction work was $258,670.27, and that on the same date complainant entered into a similar contract with the depart-ment of highways of the State of Tennessee for the construction of a concrete bridge on said Federal Aid Project No. 12, the estimated cost of which work was the sum of $11,203.84.

It was further admitted that the complainant was required to execute bonds as averred in paragraph three of the original bill; that application was made to the defendant for such bonds, and that complainant had correctly quoted a portion of such applica-tion, the original of which it was promised would be filed, and it was filed. The part quoted is as follows:

"The amount of contract is ———— dollars and the under-signed hereby agrees to pay to the company as a premium or charge for the bond applied for the sum of ———— dollars, being at the rate of fifteen ($15) dollars per one thousand of contract amount, in advance of the first two years or fraction thereof, and the sum of ———— dollars annually in advance thereafter, until the undersigned shall serve upon the company at its general office in the City of Des Moines, Iowa, competent written evidence showing it has been fully discharged and re-leased from any and all liability upon said bond, and all mat-ters arising therefrom."

And also this provision:

"It is agreed that, should the actual contract price when as-certained on final settlement exceed the amount of contract above stated, the undersigned agrees to pay the company, on demand, as additional premium, a further sum calculated at the same rate per one thousand dollars on such excess contract amount as shown in condition 3 above, and further, as addi-

tional premium on account of the maintenance or guarantee of the work or supplies, on demand, a further sum calculated at the same rate per one thousand dollars on such excess contract amount as shown in condition 3 above.''

It was admitted, as averred in the 4th paragraph of the bill, that the defendant for the stipulated price agreed to become the surety of the complainant upon these bonds, as required by Acts of 1889 and 1917, and accordingly, on November 3, 1919, it executed one bond to the State of Tennessee department of highways in the sum of $3600.96, which bond covered the concrete structure on said highway; and that on the same day the defendant executed a like bond to the State of Tennessee in the sum of $65,467.57, the highway proper; that complainant paid to defendant as premium in cash, on account of the execution of said bonds by the defendant as surety for this complainant, the sum of $4,048.10.

It was further admitted that the complainant entered upon the execution of said work as contracted, but it was averred that defendant was not able to say just what portion of said work was completed at the end of two years, and demanded strict proof thereof in case it became material.

We may remark in passing that it had been averred in said paragraph of the bill that—

"Complainant entered upon the execution of the work contemplated in said contracts, and at the date of the expiration of the two years for which said original premium was paid the complainant had done approximately one hundred forty-four thousand five hundred and forty and 27/100 ($144,540.27) dollars of the estimate contract on the highway; and on said date the complainant had executed work under the smaller contract amounting to approximately three thousand one hundred and twenty-seven and 1/100 ($3,137.01) dollars.''

We think the proof substantially establishes this to be true.

The answer further admitted:

"The bill averred that sometime prior to November 7, 1921, the department of highways became convinced that the highway being constructed by complainant, and being Federal Aid Project No. 12, should for satisfactory reasons be radically changed. The contract originally called for crushed stone base and a water bound macadam top. The department of highways deemed it advisable to change the construction to a hand placed coarse stone base and an asphalt penetration top. As a consequence on the date mentioned, November 7, 1921, what is denominated as a supplemental agreement was entered into by the complainant with the depart-

ment of highways, whereby the character of the said road being constructed was changed as indicated, and the estimated cost of construction was increased from $150,000 to $200,000, the exact amount will be shown in the proof.'' That—

"The department of highways was either of opinion that no additional bond was required by the laws of Tennessee when this supplemental agreement was entered into, or upon the other hand, if as a matter of fact the laws did require an additional bond, the said department overlooked that fact and complainant was not advised that any additional bond was necessary. However that may be, the complainant was not at the time called upon by the department or required to execute any additional bond. About three months after said supplemental agreement was entered into, and on the 9th day of February, 1922, the complainant, being of the opinion that the department of highways might require an additional bond covering the additional cost represented by said supplemental agreement, and being of opinion that the department might require the assent of the department surety to the change which had been made in the contract, wrote to the agent of the defendant submitting certain data and figures with reference to the estimated cost of this construction work, the amount of work that had been done up to November 1, 1921, and the amount of premium that had been paid for the bond, and this complainant then suggested that the defendant execute for the complainant a new bond covering the additional estimated cost of the work, and that the complainant be allowed a credit of $2139 on account of the premium which it had paid to the defendant, which had not been earned by the defendant because of the cancellation of work representing that amount of the premium under the original contract. The defendant having ascertained that a material and radical change had been made by the department of highways in the original contract of this complainant, failed and refused to answer the complainant's said letter. On March 7, 1922, complainant again wrote to the agent of the defendant, referring to its letter of February 9, 1922, and requested an answer to the proposition set forth in said letter. The defendant also failed and refused to answer this letter, and so far as this complainant is advised, the defendant never at any time made specific reply to the letters referred to. Defendant is called on to file said letters in this cause.''

Regarding this allegation the answer replies:

"Defendant admits that sometime in November, 1921 a supplemental agreement was entered into between the State highway department and this complainant in which there was some changes in the construction of said road, and that under the supplemental agreement the cost of completing the two said contracts was con-

siderably increased. The defendant, however, denies that any additional bond was required, as the supplemental agreement became a part of the original agreement and was entered into with the knowledge and consent of the highway department, this complainant, Southern Construction Company and this defendant, Southern Surety Company, and that all parties acquiesced in said change."

"This defendant admits that there was some correspondence between the complainant Southern Construction Company and this defendant and that several conferences were had and this matter thoroughly discussed, but this defendant avers that it at all times through its representative stated to this complainant that it was bound on said bond, and that it had acquiesced in said change and supplemental agreement."

The bill averred that complainant was never at any time required to execute any new or additional bond to the highway department, and that, so far as the complainant was able to inform itself, it was charged upon information and belief that the defendant never in any way consented to waive its rights growing out of the change in said contract, and that it never at any time in any way assumed any obligations to the State of Tennessee or otherwise on account of the new additional construction work referred to in said supplemental agreement and covered by it; that it assumed no liability on account thereof.

It was averred that complainant prosecuted the work with reasonable diligence and that the roadway and structures thereof have been completed. so far as complainant knows. to the entire satisfaction of the department of highways; that in fact substantially all of the estimates for the work done by it on said highway have been paid. and that there remains to be paid to the complainant on account of said work by the State of Tennessee the retainage, and perhaps a small estimate. That at the present time the only work remaining to be done to fully complete said highway is what is known as "dressing" and "shouldering" the roadway. and perhaps some ditching; that, however, the work remaining to be done would require only a few days time and is of a minor character. That since this construction work is now about completed. and that since it is perfectly manifest to the defendant that no liability to the State of Tennessee of any kind or character has been incurred by it by reason of its having become the surety off this complainant upon the bonds referred to, and that since it is manifest that no liability can accrue. and that since it is well known to said defendant. or at least should be well known to it. that this complainant is perfectly solvent and amply able to pay all just demands against it, said defendant is asserting a claim against complainant grow-

ing out of these matters amounting to approximately $3000, the exact amount of said claim being unknown to complainant at the present time; that the defendant contends that it is entitled to collect a premium from this complainant based upon the entire cost of said construction work represented by the final estimates issued by the State to complainant, which, in fact, is a demand for the premium, calculated on a basis of approximately $450,000 at the rate of $15 per thousand, less a credit for the amount heretofore paid by the complainant to defendant; that the defendant is threatening to file its said claim with the department of highways for the purpose of tying up the funds of this complainant now in the hands of said department and held by it as retainage on account of this construction work.

It was alleged that under the law, and particularly chapter 74, section 6 of the Acts of 1917, the department of highways, before making a final settlement for road construction work of the character herein described, is required to advertise for thirty days for those who have claims growing out of said work against the contractor to file said claims with said department of highways, and thereupon said department, when said claims are so filed, to retain a sufficient amount of the funds of the contractor with which to liquidate said claims and until said claims are properly adjudicated in some court of competent jurisdiction, or are otherwise settled by the parties. That the department of highways is retaining against complainant more than $20,000 on account of this construction work, and it is against this retainage that the defendant is threatening to file this claim, and if said claim is so filed it will operate to tie up a sufficient amount of the funds of this complainant to liquidate said claim as filed by said defendant; that the claim was wholly unjust; that upon the other hand the defendant is justly indebted to complainant in the sum of $2139, together with interest thereon from November 7, 1921; that under the provisions of the application hereinbefore quoted, as uniformly construed by the defendant, the premium paid by the contractor is to be finally adjusted upon the basis of the actual contract price; that the original contract on which the defendant became bound was so abated by the highway department of the State of Tennessee that $2139 of the entire premium paid was never earned by the defendant, and under this contract and the uniform interpretation of the contract by said defendant, it is justly indebted to the complainant in that amount.

It was further alleged that the defendant was about to institute a suit or suits against the complainant, the point or place where said suit was to be instituted being unknown to complainant at the present time, but presumably in Davidson county, Tennessee, in an effort to force complainant to pay said sum of approximately $3000.

It was insisted in the bill that by the modification of the contract hereinbefore referred to, the original contract was materially and radically changed, without the consent of the surety; and that the surety, as complainant was advised and believes, refused to enter into any new bond, or to become bound upon the old bond for the new work provided for under said supplemental agreement, although it was, as is hereinbefore alleged, requested to do so by letters from this complainant; that by reason of said material and radical change in said contract the defendant was released from liability, not only for the increased work contracted for, but also it was released from all liability to the State on account of the bonds which it had originally executed, and from and after November 7, 1921, the defendant was and has been under no obligation whatever to the State of Tennessee as surety for this complainant, but that nevertheless, as alleged herein, since the work has been satisfactorily completed and all possible liability has been terminated, the defendant is seeking to collect large amounts in additional premiums, and is threatening wrongfully to tie up the funds of this complainant in the hands of the highway department, and that it would do so unless restrained by injunction; that complainant was solvent, etc.

The answer admits that complainant was not called upon by the highway department to execute a new bond for the additional work, because it was alleged that this defendant advised the highway department that it was bound on said bond and there was no necessity for the highway department requiring two bonds to be made.

It was denied that it did not assume liability on the additional work covered by the supplemental agreement, but avers that it did assume liability, in that said supplemental agreement was entered into between the highway department and complainant, and that defendant had knowledge of same and acquiesced in and ratified said change.

The answer stated that defendant is not informed as to how near these contracts are completed, but denies that because it appears that there will be no liability on said bonds that it is now making demands for said additional premium. It admits that it is making demand for additional premium because, as hereinbefore stated, it is claimed that defendant has been liable on said bonds of complainant covering the entire contracts herein mentioned, and therefore, is entitled to said premium.

It was stated that defendant was making no effort to have its claim for premium declared a lien on said retained percentage, and is advised that said claim is not a lien. The answer avers that its claim against complainant for additional premium is due and just, and that complainant could not have performed this contract under the laws of the State of Tennessee without executing a bond

with some bonding company, and it was averred that complainant cannot after enjoying benefits of said bond deny it is liable, and that it is estopped from saying that this defendant was not bound, and that defendant especially pleads estoppel as a defense.

It was averred that it had been bound under said bond during the entire life of these contracts, and that it had always recognized its liability to the State highway department, and that it was now and had at all times been ready to carry out and fulfill the terms of said bond.

The defendant admitted that it would be necessary for this contract to be completed before it could be definitely determined what amount as premium will be due on said bonds, but it was averred that it would be approximately $6000. It was therefore averred that complainant owes defendant the sum of approximately $6000, and that it was advised that it had the right to file the answer as a cross-bill and have all rights growing out of this controversy adjudicated in this cause.

This it did. The cross-bill was answered, denying any insistence of the defendant and cross-complainant otherwise than as stated in the original bill.

Subsequently the bill was amended of record so as to show or allege as follows:

"That prior to November 1, and sometime during the summer months of 1921, the State highway department and the complainant entered into an agreement or contract whereby the plans and specifications for the construction of the road known as Federal Aid Project No. 12, were materially and radically changed. The amended contract called for what is known as a hand placed base course No. 1, eight inches in depth. And a wearing surface of bituminous macadam two and a half inches in depth instead of the pavement described in the original contract. The complainant began the execution of this new agreement about the month of July, 1921, and during that month and the months of August, September and October a large amount of work was done upon the road under this new contract, whereby what is commonly referred to as a Pelford base was being constructed instead of the original crushed stone base called for in the contract entered into in October of 1919. This change in the contract which was radical and material, together with other material changes, was not consented to by the surety, the defendant herein, and the defendant was released from all further liability thereon. The work called for by the original contract was suspended and terminated by the new agreement.

"Sometime later and prior to November 1, 1921, the contract was again modified and changed so as to call for a standard hand placed coarse stone base, and this contract and agreement between the State and the complainant is the one evidenced by the writing

of November 7, and, while the written contract was actually signed on or about November 7, 1921, as a matter of fact it was agreed to prior to November 1st, but the date of its execution was delayed incident to transmitting it through the mails and for other causes to be hereafter shown.

"The defendant never at any time consented to any of these changes and modifications in the original contract, and, as alleged in the original bill, it failed and refused, upon being notified of these changes, to enter into any new bond or new arrangement whereby it would be bound as the surety of this complainant, and the complainant pleads and relies upon the facts set forth in the original bill and herein set forth as an estoppel against the defendant to claim any liability whatever against the complainant on account of the execution of these bonds.

"The answer of the defendant will be deemed and treated as amended and refiled so as to deny the charges set out forth in the within and foregoing amendment with leave to defend practice on the points by amendment to said answer said amendment to be filed in thirty days from this date."

The cause, upon demand, was constituted a jury case, and issues being made up under the direction of the Chancellor the cause came on to be heard before the court and jury, the issues being set out and the action of the jury thereon in the final judgment of the court, as follows:

"Came the parties by their attorneys and came the same jury as on yesterday and the jury having heard the charge of the court and there having been submitted to the jury the following issues of fact, which were made up under the directions of the court and the jury having retired and considered of their verdict returned into open court and submitted in writing to the court answers to said issues of fact, the unanimous verdict of the jury as follows:

"Issues submitted to the jury:

"I. Was the Southern Surety Company released from liability on the bond executed by it November 3, 1919, by the agreement of about July, 1921, made between the State highway department and the complainant? A. Yes.

"II. If you say the defendant was released from liability by the agreement of about July, 1921, then answer. Did the defendant take any action whereby its legal liability to the State as surety for the complainant was renewed on or after July, 1921? A. No.

"III. What part of the original premium paid by the complainant to the defendant was unearned on August 1, 1921? A. $2139.

"IV. What sum is complainant entitled to recover from defendant on account of unearned premium? A. $2139.

"V. Did the defendant consent to or acquiesce in the changes and alterations of the original contract which were made by the new agreement entered into about July, 1921? A. No.

"VI. If you answer question No. 1, 'No' or if you answer question No. 2, 'Yes' then answer, what amount is due the defendant Southern Surety Company from the complainant Southern Construction Company as premiums on bonds executed by the Surety Company as surety for the Construction Company? A. ————.

"It is further adjudged and decreed by this court that the complainant Southern Construction Company have and recover of the Southern Surety Company, said sum of $2139 with interest at 6% per annum from the 7th day of November, 1921, together with all the costs of this cause for which let execution issue."

It is proper to state that at the close of the complainant's proof the defendant made the following motion, which was overruled:

Mr. Travis: "We want your honor to give a directed verdict, to instruct the jury to return a verdict against the complainant's claim set up in the original bill, there being no evidence to support the finding of the jury for the complainant."

This motion was not renewed at the close of all the proof, and therefore should be treated as abandoned or waived. Nashville Railway, etc., Co. v. Henderson, 118 Tenn., 284.

Thereupon the defendant, the Southern Surety Company, made a motion for a new trial, which is somewhat lengthy and is here referred to as set out, beginning on page 176 of the record down to and including page 189 thereof, when the court disposed of the same in the following order, to-wit:

"This cause came on to be heard before the Hon. J. H. Wallace, Chancellor, on the motion of the defendant Southern Surety Company for a new trial, which motion has heretofore been entered in the record in this cause, and which was taken under advisement by the court. On consideration of the same, the court is of the opinion that complainant is not entitled to recover any part of the premium paid to the defendant and that the court should have directed a verdict in favor of the defendant on the third, and fourth issues of fact, and the verdict of the jury on the third and fourth issues will be set aside and the complainant's bill dismissed. The motion of the defendant for a directed verdict on the first, second and fifth issues is denied and the verdict upon said issues is approved by

the court, and the cross-bill of the defendant is dismissed. In all other respects the motion for a new trial, of the defendant is overruled."

Thereupon the complainant made a motion for a new trial, which was overruled, and the following decree entered.

"It is, therefore, the judgment of the court that the original bill in this case be dismissed, and that the cross-bill be dismissed, and that the parties respectively pay one-half of the costs herein accrued, and judgment is hereby rendered against the complainant for one-half of the costs of this cause and against the defendant for one-half of said costs, for which execution will issue.

"To the action of the court in refusing to set aside the verdict of the jury on the first, second and fifth issues of fact and in failing to charge the jury as requested and taxing it with one-half of the costs in dismissing the defendant's cross-bill, the defendant excepts and prays an appeal to the next term of the Court of Appeals at Knoxville, which is granted on condition that defendant give a good and sufficient appeal bond as required by law.

"To the action of the court in overruling the motion of the complainant for a new trial and in directing a verdict in favor of the defendant on the third and fourth issues of fact, and in excluding the testimony of L. O. Scott and in dismissing the original bill and taxing the complainant with one-half of the costs, the complainant excepts and prays an appeal to the Court of Appeals at Knoxville, Tennessee, which is granted upon the execution by the complainant of an appeal bond as required by law."

Both sides having perfected their appeals, both have assigned errors. It has been correctly admitted in defendant's brief that, if the case should be reversed on complainant's assignment of error, it will not be necessary to consider those made by the defendant. Such assignment by the complainant will be considered first. They are:

"I. The court erred in sustaining the motion for a directed verdict on issue No. 3 and in setting aside the verdict of the jury. The evidence preponderates in favor of the verdict of the jury.

"The issue referred to was in the following language:

" 'Q. What part of the original premium paid by the complainant to the defendant was unearned on August 1, 1921? A. $2139.'

"The jury had already found, in answer to issue No. 1, that the Surety Company was released from liability by the new

agreement which was made with State highway department in July, 1921, and the jury had also found, in answer to Issue No. 2, that the Surety Company had taken no action whereby its legal liability to the State, as surety for the complainant, was renewed after July, 1921.

"There is no controversy in the record in regard to the figures. Mr. Tom Scandlyn, the book keeper of the Construction Company, was introduced as a witness (p. 102) and he testified in regard to the amount of the premium unearned on the date mentioned, giving the figures as two thousand one hundred thirty-nine and 91/100 ($2139.91) dollars. (p. 104.) There is no proof to the contrary, and the question presented by this assignment and by the record is really a question of law, but, since this question of law will be applicable to other assignments as well, we will state the other assignments of error before proceeding to a discussion of them."

"II. The court erred in setting aside the verdict of the jury on issue No. 4 and in directing a verdict thereon in favor of the defendant. The evidence preponderates in favor of the verdict of the jury."

"This issue was in the following language:"

"'What sum is complainant entitled to recover from defendant on account of unearned premium? A. $2139.'

"III. The court erred in holding as a matter of law that the entire premium paid by the complainant to the defendant was earned, and in further holding that the complainant would not be entitled to a return of any portion of said premium except by a termination of the contract by a completion of the work thereunder showing that the original estimated amount of the contract was overstated. The court should have held as a matter of law that, when the contract was terminated by agreement of the contracting parties whereby the estimated amount of the contract upon which the premium was paid was shown to be an over estimate, that the complainant would then be entitle to recover the unearned portion of the premium."

"IV. The court erred in excluding from the consideration of the jury the following testimony of the complainant's witness, L. O. Scott:

"'State what the conversation was with Mr. W. C. Rinearson with reference to how this premium was to be settled? A. My conversation was with the entire company, Mr. Durell, Mr. Anderson, Mr. Rinearson, and perhaps one or two others. I simply told them we would pay on the amount of the contract for the period it was to run, and if the contract finally exceeded what we paid, we would pay an excess premium, or if the contract was less they would refund us.'

" 'Q. And at that time you were the agent of the Southern Surety Co.? A. Yes, sir.'

"And in excluding the following testimony:

" 'Q. And has that been the custom upon which settlements of this character are made? A. Yes, sir.'

"And in excluding the following testimony:

" 'Q. Mr. Scott, where did you get the authority to make a statement of that kind for the Southern Surety Co.? A. It is a rule with all companies.'

" 'Q. Did you have any authority from the home office of the Southern Surety Co., or from the state agent, authorizing you to make a statement like that? A. No, sir, I knew it was a general rule.'

"And in excluding the following testimony of said witness:

" 'Q. I will ask you if you had the placing of this insurance business under your absolute control and could have placed it with any other company you saw fit? A. Yes, sir.'

" 'Q. And was that because of your connection with the Southern Construction Company? A. Yes, sir.

" 'Q. And Mr. Chas. Sykes was present in your office when some members of the Southern Construction Company were presents? A. Yes, sir.'

" 'Q. And did he engage in this conversation in which there was a discussion in regard to the premium? A. Yes, sir.'

" 'Q. And the way it should be paid? A. Yes, sir.'

" 'Q. And you know that Mr. Chas. Sykes was present in Harriman on that occasion representing the Southern Surety Company? A. Yes, sir.'

" 'Q. How long has he been with that company that you know? A. A number of years.'

" 'Q. And while you were an agent of his company? A. Yes, sir.'

" 'Q. What was his position with the company? A. A general agent.'

"V. The court erred in dismissing the original bill and taxing the complainant with one-half of the costs. The original bill should have been sustained by the court, both in its injunctive feature and as a bill to recover the unearned portion of the premium which the complainant paid to the defendant."

It will be seen that the court was of opinion, and agreed with the finding of the jury on the first, second and fifth issues, that the defendant Surety Company was released from the bond executed by it November 3, 1919, and that being released the said defendant did not take any action whereby its legal liability to the State as surety for the complainant was renewed on or after July, 1921; and that

said defendant did not consent to, or acquiesce, in, the changes and alterations of the original contract, which were made by the new agreement entered into about July, 1921, and approved the verdict on said issues, dismissing the cross-bill for such reason, and otherwise, overruling the motion of the defendant for a new trial. He was yet of opinion that complainant was not entitled to recover any part of the premium paid to the defendant, and that he should have directed a verdict on the third and fourth issues in which the jury found that the unearned part of the original premium paid by complainant on August 1, 1921 was $2139, and that complainant was entitled to recover from the defendant this sum on account of unearned premium, and therefore he dismissed the bill.

In this we think he was in error. The motion made at the close of the complainant's proof for a directed verdict, not being renewed at the close of all the proof, was waived, and while if dissatisfied with the verdict upon the merits he should have granted a new trial, but, having granted it, the case still was a jury trial, and dismissing it under the circumstances was taking the case from their consideration and usurping their functions. This motion made at the close of complainant's proof appears to have been the only one made for a directed verdict. The Chancellor was evidently of opinion that when the risk attached there could be no return of the premium, notwithstanding that under the exigencies of the contract and its own provisions it terminated even before the actual cost price which controlled the premium obligation had reached the estimated cost price named in the application and contract as the conventional and tentative arrangement.

We think when it was provided, notwithstanding the estimate named, that the actual cost of the work at the rate of $15 per thousand should actually determine the amount due as premium, that the contract, also contemplating a condition whereby it might be terminated before even the estimate was earned, it follows as a corollary that the cost of the work when it so terminated apportioned the premium due under the contract, and, therefore, evidenced the amount unearned.

The subject of the change was taken up in May, 1921. They proceeded until July, 1921, when a new agreement was arrived at which changed the character of the construction, and a letter of July 18, 1921 was transmitted by the highway department to the company containing four copies of the supplementary agreement covering the proposed changes in the type of construction of the road. In this letter it was stated that the chief engineer, Mr. Rinearson, stated in writing at the time that any change in prices or specifications agreeable to Mr. Hill were acceptable to the company. "I am informed that the State highway company have ap-

proved these prices, and I am therefore requesting that you sign all four copies of this supplementary agreement at your earliest convenience, returning same to my office, after which they will be forwarded to the State highway commission for the signature of the proper State officials. After these agreements are signed by the State you will be furnished a copy for your official records. (signed) T. W. Webster, Division Engineer.'' These agreements were signed, evidencing the Construction Company's assent to the change, which had been agreed upon sometime between May and July. Later on the highway department desired an additional change, and in October, 1921, another letter was sent to the Construction Company, in which it was stated:

"I return herewith copies in quadruplicate of your supplementary agreement to construct hand placed base No. 1, 8'' in depth for $0.85 per square yard, and bituminous macadam surface 2½ inches in depth for $1.05 per square yard on Federal Aid Project No. 12, in Union and Claiborne counties. I enclose also a revision of this supplementary agreement in which standard hand placed coarse stone is substituted for the hand placed base course No. 1 in supplementary agreement originally signed and specifications for the standard hand placed course stone base is enclosed herewith.''

It was explained in the letter that this action was in line with the bureau of public roads, which wished to establish a single uniform specification for course stone base construction throughout the State, rather than so many special specifications, such as modified Telford, hand placed base course No. 1, hand placed base course No.. 2, etc., and also that this specification for the standard hand placed course stone base is very broad, allowing considerable latitude in its construction, and covers the essential features of construction in all three of the aforementioned special specifications; and it was requested that this supplementary agreement be executed and returned to the office of the department at their earliest convenience.

This was a variation from that adopted in the new contract agreed upon in July, as to the base stone. In the July change it was to a hand placed base course No. 1, and it was laid in the following manner: The stone was quarried and broken into what was commonly termed "one man size" stone. These stones were then hauled to the point of construction by truck or wagons and dumped on the road bed, after the sub-grade had been properly prepared, and each stone was picked up by a man and placed in the road bed with the side edge down, usually with the longest way of the stone across the road. They were placed in that way as close up together as they could be placed, and then the high points were napped off by men with hammers and broken off smooth. The road roller was placed on this stone and it

was rolled down, and then crushed stone or gravel was used in filling those voids that were left between the stones, and when they were filled the roller was placed on it again and the whole rolled down, and then if any voids appeared additional crushed stone or gravel was hauled and spread over the road and rolled again until the whole was thoroughly filled and compact and a solid mass, and was left approximately eight inches thick. Where as the kind of road being constructed under the original contract of October, 1919, guaranteed by the bonding insurance company did not specify any thickness, but read this way: "128,734 square yards of broken stone base course special at 47½ cents per square yard," and thickness as specifications were furnished. The rock is quarried and run through a crusher. It is then spread on the road after the sub-grade is prepared. It is then rolled and watered and filled with dust, and this process is continued until that base is solidified to whatever thickness is required; and then a second course of crushed stone rock is placed on top of this base, and rolled, watered and dusted, until the whole is thoroughly compacted. When the stone was crushed it was hauled to the point of construction by truck and spread on the road by means of what is known as a spreader box, then rolled and filled, and each individual stone did not have to be placed by hand.

It is manifest from this that the change to this character of road was a material and radical change, involving a heavier and much more enduring character of road and greater time and expense in its construction, in this instance an increase of over $150,000, and entailing a much more serious risk. The contract in its final form, though agreed upon and acted under, it seems was not completed by signatures of all until about November 7, 1921, though no more work was done under the original specifications; the total amount up to the time of the change being—on the bridge contract $3,127.01, and on the road contract $141,413.26.

It is proper to state that in our opinion the matter as to the bridge, being under a separate and severable contract, was never forfeited or rendered invalid, and the liability of the defendant Surety Company as to it continued thereunder; and whatever may be found due as premium on this bridge contract should be credited on any judgment which complainant may be entitled to as unearned premium on the road feature in question, regarding which it is our opinion that the original contract of October, 1919, was terminated by the execution of the new contract, which so radically changed its provisions as to release the defendant as surety, who was and became no longer bound thereafter on the larger undertaking as affecting the road proper.

If it be conceded that the terms of the contract fixing the final cost price as the basis from which at the rate of $15 per thousand to

calculate the amount that would be due the defendant did not necessarily imply that by the ending of the contract before such estimated cost was earned (a possible contingency contemplated by the contract), an excess payment would be discovered, which should be returned. We think the jury was authorized to find that it should be recovered, both Mr. Scott and Mr. Kennedy having testified substantially that the custom was, if the amount of the contract exceeds the estimate you pay the company at the same rate an additional premium, but if there had been an under estimate the company will refund the unearned premium.

It is proper to state that a general objection was made to this testimony, and properly overruled. However, Mr. Scott, who was the local agent of the defendant Surety Company, and interested also in the Construction Company, in discussing the insurance in the presence of the officers of the Construction Company and Mr. Sykes, the general agent of the Surety Company, had stated for the complainant: "We would pay on the amount of the contract for the period it was to run, and if the contract finally exceeded what we paid we would pay an excess premium, or if the contract was less they would refund us." This manner of settlement of the policy was discussed in the presence of Mr. Sykes, the general agent, as stated, who finally closed the deal with the general officers of the Construction Company. Mr. Scott's testimony was competent, and assignment No. 4, that the Chancellor was in error in excluding it, is sustained.

Mr. Scott also testified in the evidence excluded, which was certainly competent, that this was a general rule of all companies, and a general rule of the defendant company to this effect. This testimony was not in any contravention, we think, of that part of the contract shown to be in writing, but was explanatory or supplementary thereto, and competent as tending to establish the contentions of the original bill as to the contract.

We do not think it can reasonably be contended but what the new contract entered into was such a material change as that it released the Surety Company, and that they could not thereafter be bound except upon their consent. This is elemental. Nor does it appear from the record that this consent was ever given, even had it been competent under the law requiring advertisement for bids for such work contemplated in the supplementary agreements, and bonds to be executed in a sum satisfactory to the department before such contracts were let, for the State to have accepted the old bond in lieu of that required by the statute. However, it does not matter in this case whether it affected the validity of the new contract or not, except as to defendant Surety Company. In any case by the action of the State it terminated the old contract and, it is thought, created

no obligation of the defendant Surety Company to the State on the old bond for the new work.

It was claimed in the answer that the new contract was entered into by and with the knowledge, consent and acquiescence of all the parties, but it was confessed in the proof that the defendant Surety Company never knew anything about the change until some time thereafter. It was then contended that by agreement made with the Construction Company it had become bound, but the record does not bear this out. In one of the conferences had sometime thereafter the Surety Company's agent, Mr. Sykes, had expressed a willingness to become liable on the bond, after he learned of the change, but never did so. The letters of February 9th and of March 7, 1922, which was an attempt to adjust matters and to receive their obligation for the new engagements, remained unanswered, which, together doubtless with some previous manifestations on the part of the Surety Company of uneasiness as to the solvency of the Construction Company because of suits being prosecuted against it by reason of the default of subcontractors in other engagements, led them to conclude that the Surety Company was not bound. Certainly no tacit understanding can be inferred from this as to an assent to liability.

It was next claimed that there had been an agreement between the highway department and defendant that the Surety Company should remain liable. Aside from the fact that it would also require the assent of the Construction Company to bind it to extended obligations, we think this alleged agreement with the State was more the after construction of Mr. Sykes upon what really occurred between his company and the department than the result of any real concord between the parties. After Mr. Sykes learned of the change he wrote to the department or obtained from it a statement as to what the changes were, and upon inquiry as to the bond he was told in the letter ———— that the State did not release the bond, that they regarded the increased obligations effected by the supplementary agreements as not such a material change as to effect such a release. This was really all that occurred between the State and the Surety Company, as we think the evidence really shows. This effected no contract with the State either by concord or estoppel, nor was the Construction Company advised of this correspondence in any way so as to bind it, either upon the grounds of assent or estoppel. Nor did the Surety Company say to the Construction Company that it was or would be bound under the old engagement for the new obligations.

At last it is relegated to the question as to whether or not the Surety Company continued bound under the old engagements by its express or implied terms for the increased risks entailed by the new agreements, in the absence of subsequent express or implied con-

tracts making the provisions of the old applicable to the new, and as to this we think there can be no question.

The clause of the contract, which authorized the State to make either minor material changes is as follows:

"The engineer reserves the right to make such alterations in the plans or in the character of the work as may be considered necessary or desirable from time to time to complete fully and perfectly the construction of the roadway, provided such alterations do not change materially the original plans and specifications, and such alterations shall not be considered as a waiver of any condition of the contract nor to invalidate any of the provisions thereof. Should such alterations in the plans result in an increase or decrease of the quantity of work to be performed, the contractor shall accept payment in full at the contract unit prices for the actual quantities of work done; or should such alterations in the character of the work be productive of increased cost or result in decreased cost to the contractor, a fair and equitable sum therefor, to be agreed upon in writing by the contractor and the engineer before such work is begun, shall be added to or deducted from the contract price, as the case may be. No allowance will be made for anticipated profits."

It is seen that immaterial changes were not to affect the contract with any feature of voidance, but that material changes would necessarily have that effect, requiring agreements to authorize them, and when effected they were not only supplementary but necessarily new contracts, the effect of which was to terminate the old, fixing the status as of its completion and actual cost as of that date, thus measuring and ascertaining the final obligations of the Construction Company to the Surety Company as to premiums as effectually as any completion of the whole work under the specifications of the old contract could have done. We are aware it is insisted by the defendant that an annual premium was collectible under the contract "annually in advance thereafter until the undersigned shall serve upon the company, at its general office in the City of Des Moines, Iowa, competent written evidence showing it has been fully discharged and released from any and all liability upon said bond, and all matters arising therefrom." We do not think this section of clause three was a part of the contract, but the proof shows that as early at least as December, 1921 the defendant's agent had notice of the changed contract; had in the conference that had taken place expressed a willingness to become liable, but had manifested an uneasiness at other situations that had then developed, had secured from the State copies of the supplemental agreements, after which it had received complainant's letters of February 9th and March 7th,

which it ignored, and then waited, with the situation thought to be well in hand, until the work was about completed, and then as late as November 6, 1923 inquired of the department whether it had been released, and received this reply:

"Southern Surety Co.,
"Church St.,
"Nashville, Tenn.

"Nashville, Tenn.,
"Nov. 6, 1923.

"Attention: Mr. Chas. Sykes.

"In reply to your inquiry this morning relative to your bonds for the Southern Construction Company, Federal Aid Project 12, in Union and Claiborne counties, I beg to advise that the department has in no way released the original bond, nor does it expect to until the final acceptance of the work, as all arrangements for change in the type of construction have been supplementary to the original contracts and in accordance with the provisions of the specifications forming a part of these contracts."

The next day the defendant transmitted this letter to the Construction Company. We think even if that were sufficient it had not estopped itself to deny liability to the State on the road contract, though there having been no change it was still liable under the bridge contract. Mr. Bass' mistake as to the law made at this late date would not work an estoppel or effect a contract, though at this stage it was greatly to the interest of the Surety Company that it be regarded as bound.

The State having the right under the specifications of the original contract to make even material changes, the contract of insurance was entered into in view of this important fact, though it did not oblige the contractor to make any other or additional contract, nor the insurer to continue bound. A change in the contract therefore in this regard was tantamount to a completion of the original contract at a much less figure than was contemplated in the estimate fixed in the contract of insurance, nor could it make any difference that the contractor acquiesced in the change and made a new contract. It could not do otherwise without quitting the job. And the fact that it took a new contract did not forfeit any of his rights under the old, nor create any new obligations to the defendant without his consent. It is not simply the case of making a question for the surety which he has the right to forego, as insisted in defendant's brief, but it is one also of charging the complainant with obligations to which he never assented.

It is earnestly insisted that this case falls within the provisions of Crouch v. Surety Company, 131 Tenn., 260, where the risk was entire, and neither it nor the premium could be apportioned. But

we think that is not this case, where the contract is to make the final actual cost the criterion of what is due as premiums to the insurer, thus apportioning both the risk and the premium.

We think the construction placed both upon the construction contract and the bond by the highway department was erroneous, but if their action could even be regarded as persuasive, it appears to have been weakened by the fact that before making settlement with the Construction Company they required it to make a new bond, and the statement of the engineer in substance that they had not continued the practice of letting out such contracts without advertisements or bonds.

On the whole we think there was evidence to sustain the verdict, at least in some amount in favor of the complainant, on the issues submitted, and that the Chancellor was in error in dismissing the original bill, and his decree to this effect is reversed.

We are of opinion also that there was no reversible error in the refusal of the Chancellor to grant a new trial on any of the assignments of the defendant following the first.

Even if the limited appeal of the defendant and cross-complainant has not waived the question of a new trial as to some of these assignments of the defendant, there was no error in the admission of the testimony of Scott and Kennedy, as claimed, nor for the alleged newly discovered evidence. The alleged carbon copy of an overlooked letter, we think under the circumstances should not have been over looked or forgotten. It was supposedly addressed to the Construction Company in relation to the attitude of the Surety Company as to the old bond obliging for the engagements of the new contract, and if written at all must have been after the reception of the letter of February 9th. This letter was not received by the Construction Company, and Mr. Sykes testified that he did not answer either that of February 9th or March 7th following. Besides it does not appear what evidence was before the Chancellor when he disposed of this particular insistence. It is true that as of a date previous to this motion for a new trial there is a statement in the bill of exceptions that this was all the evidence in the case, but this relates to the evidence that was introduced on the trial. It is also true that an order of the court shows certain affidavits were filed in support of the motion, which were copied in the order; but the order does not show, neither does it otherwise appear that these affidavits were all the evidence heard upon the motion for a new trial, and it is essential that this somewhere affirmatively appear, otherwise it will be presumed that the Chancellor acted upon sufficient evidence.

Neither do we think that there was any material error as claimed with reference to the charge, in the view we have taken of the evidence, but as the case is to be reversed and remanded for a new

trial upon the issues made by the original bill touching the amount that may be due the complainant thereunder for unearned premiums, we do not think the defendant should be handicapped in any way in asserting under his cross-bill any claim for additional premiums that might be due him regarding the bridge contract, and that therefore the decree of dismissal of the cross-bill should also be reversed under the first assignment, in order that the defendant may be allowed to set up as an offset anything that may be due him under the bridge contract against what may be due the complainant as unearned premium.

A decree will therefore be drawn reversing the decree of the Chancellor and remanding the case for a new trial, as indicated. The costs in this court will be equally divided between the complainant and defendant, and adjudged against them and their securities on their appeal bonds.

Portrum and Thompson, JJ., concur.